IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MIKE'S, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:13-cv-232-DRH-DGW |
| | ) | |
| Vessel WHITE STAR ONE, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S REPLY TO DEFENDANTS' MEMORANDUM
IN OPPOSITION TO MOTION FOR INTERLOCUTORY SALE OF VESSEL**

In accordance with the Court's Order [doc. 40], Plaintiff submits the following reply arguments to two issues contained in Defendants' response [doc. 39] opposing Plaintiff's motion for interlocutory sale of the vessel.

**A. Plaintiff will be prejudiced by further delays because the vessel will continue losing value, incurring expenses, and cause risks for additional damages**

Defendants' response suggests that the resolution of Plaintiff's motion should be delayed for several more months due to their recent "attempt" to obtain new financing. Defendants have not, however, submitted any security or otherwise sought release of the vessel as required by Rule E(5). Defendants' failure to post a bond is a telling acknowledgement of its inability to satisfy their obligations to Plaintiff apart from the sale of the vessel. Instead, Defendants merely offer this Court a hope of a future refinancing, based upon very recent[1] efforts that began in late June, to sway the Court against ordering the sale now. No explanation is provided for why Defendants did not attempt any of these actions until a motion for a court-ordered sale of their property had been filed, although the vessel was arrested in March, and Defendants have not paid Plaintiff for many months before that.

---

[1] Manley's appraisal occurred on June 24, 2013 and his report was drafted on June 30, 2013. The purported boat space rental agreement is dated June 28, 2013.

Despite the fact that the vessel remains under arrest, Defendants hired a marine engineer, performed an appraisal, designed an alternative mooring location, signed a new storage contract with Polestar Marina (which appears to be a typical marina for storing relatively small pleasure craft, not a 400' x 56' casino vessels)[2], and allegedly have begun work to construct and install the alternative mooring facility. In the absence of a bond or other approved security, however, all of this work is based on an *assumption* that the Court would approve Polestar Marina as the substitute custodian for the seized vessel. Yet, Defendants have not filed any such motion or submitted an affidavit, insurance information, or other pertinent information setting forth Polestar Marina's willingness and ability to serve as an appropriate substitute custodian for the vessel.[3] While Plaintiff certainly wishes to reclaim the enormous space the vessel has occupied, the vessel remains Plaintiff's only security for payment of its valid pre-seizure and post-seizure damages.

Since the purchase of the vessel in 2008 for $2,500,000, the vessel has already lost nearly $1,000,000 in value—approximately $200,000 per year—according to Defendants' own surveyor. While Defendants seek a three month delay, there is no suggestion that the value will somehow appreciate in the next three months such that the Joselyn's deficiency and personal liability will be less after the delay. To the contrary, <u>the ongoing deterioration and loss of value in the vessel will continue to occur over the coming months—thereby *increasing* Defendants' personal liability—if the property is not sold immediately.</u> At present, multiple portions of the vessels are open to nature's elements, such as rain water entering the vessel. Defendants do not dispute that the boat's engines—one of the few remaining items of any value on the boat—have not been operated or maintained in more than two years.

---

[2] Photographs of Polestar Marina (Polestar Boating Center) on its website are attached as Exhibit A.
[3] There is also no indication that Polestar Marina is even aware that the vessel is currently under arrest.

Defendants have offered no case law to challenge Plaintiff's case citations that <u>maritime law gives an owner four months to obtain release of a vessel before its delay in doing so is deemed unreasonable under the law</u>, justifying the sale of the property under Rule E(9)(a).

An additional fact that urges a prompt sale is the unusually high levels of the Mississippi River. Defendants' response blames high water for their failure to remove from the vessel from Mike's, although the river experienced historic low levels in the fall of 2012 and winter of 2013, long after Defendants stopped paying Plaintiff. The high water that occurred in the spring and summer of 2013 has caused numerous problems to Mike's in connection with its fleeting of the boat. Mike's incurred the expense of installing a spar pole between the shore and its dock to better secure the large and unruly vessel. Exhibit B. Despite this additional protection, the high water's fast current, coupled with the vessel's large size and unusual shape, have damaged at least one mooring dolphin adjacent to the vessel. See attached Exhibit C (photograph of bent dolphin). The high water and damages already incurred present serious future risks to Plaintiff. Finally, when the weather turns cold, either additional fuel for the vessel's generators or electricity from shore will be needed several hours per day to protect the boat from freezing or even possibly sinking.[4]

### B. Plaintiff has not tried to convert its third-priority position into a first-priority position.

Defendants' assertion that Plaintiff's request for compensation at the rate of $4,500 per day for its services as substitute custodian was simply an attempt to convert its third priority lien holder position (after the Preferred Vessel Mortgages) into a first priority position as *custodia legis* is without support in the facts or the law.

---

[4] Defendant Joslyn previously hired a handyman named Loel to perform certain work such as this on the vessel, but after Mr. Joslyn stopped paying Loel, he ceased performing this work. Plaintiff has since been obligated to retain Loel to continue performing this work and expects his charges will increase as the weather cools after the summer.

Plaintiff had no meaningful alternative to a Rule C seizure to obtain relief for the fleeting and other services it had provided for Defendants without payment for many months. Defendants have never moved to vacate Plaintiff's seizure or claimed it was contrary to law. In fact, Defendants appear to concede that they breached their obligations to Plaintiff, thereby justifying the seizure. The only issue in dispute is the amount that Defendants owe Plaintiff.

Before filing the lawsuit for the seizure, Plaintiff sought information from two leading fleeting companies in the St. Louis harbor, Osage Marine, Inc., and SCF Lewis and Clark, for what they would charge if they were appointed as substitute custodian. As attested in their affidavits in March, 2013, those companies proposed rates of $4,500 and $5,000 per day if they were to be appointed. Each of those companies provided detailed explanations for their proposed rates. Since additional expenses would be incurred in transporting the vessel from Plaintiff's facility to an alternative location, Plaintiff proposed that it be paid the <u>lower</u> of those two amounts and that the vessel stay where it is, thereby saving the transportation expense.

From an earlier court order, Plaintiff understands that the daily rate for its services as substitute custodian will be determined at a later date, presumably after an evidentiary hearing or additional submissions. In any event, the legal priority of Plaintiff's claim for those services as *custodia legis* does not depend upon the amount of the daily rate the court decides.

Defendants imply that Polestar Marine's apparent agreement to fleet the vessel for $200 per day is evidence of a fair custodial rate, but that suggestion is deceptive. As set forth in Defendants' response, Polestar's possible appointment required the hiring of a marine engineer to develop a design for an "alternative mooring system," the cost of implementing that design, and moving the vessel to Polestar. The ability of a pleasure craft marina such as Polestar to care for this vessel and satisfy the legal requirements for serving as substitute custodian (e.g., experience with such vessels, sufficient insurance, substantial monetary deposit with the

4

marshal) all remain to be seen. Defendants have ignored all of these factors in proposing what they now claim is a fair rate for Mike's services as substitute custodian.

Plaintiff agreed to moor the vessel back in 2008 on a temporary, short-term basis for $200 per day, plus applicable expenses such as shore power, necessary labor, and various other charges, all of which defendants paid without protest until 2010. In the fall of 2010, defendants stopped making payments for several months. On January 1, 2011, Plaintiff increased the fleeting charges to $300 per day, which is plainly stated on the monthly invoices Defendants received from Plaintiff. Defendants did not object to the $300 daily rate or remove its vessel from the facility, but instead resumed making payments in February, 2011. On October 31, 2011, Plaintiff increased the daily rate to $500. Again Defendants did not object or remove their vessel from the facility. Instead, Defendants made five more partial payments in late 2011 and 2012, after the daily rate had been increased to $500. Finally, in February, 2013, the daily rate was increased to $1,000 per day. Using these rates, Defendants owed Plaintiff nearly $300,000 by the time the lawsuit was filed in March 2013.

If any daily rate above $200 per day is unreasonable and unenforceable, as Defendants apparently now claim, they should have moved their boat (or the very least protested) in January, 2011, when the rate first increased. Under the law, Defendants' decision to continue accepting the benefits of Plaintiff's fleeting services in 2011, 2012, and 2013, despite having a reasonable opportunity to decline further services (i.e. move the vessel), constitutes acceptance of the increased rates. *Boomer v. AT&T Corp.*, 309 F.3d 404, 415 (7th Cir. 2002)(*citing* Restatement (Second) of Contracts, Section 69).

For all of the foregoing reasons, Plaintiff respectfully requests that its motion for an interlocutory sale of the vessel be granted.

GOLDSTEIN AND PRICE, L.C.
and Robert Nienhuis
and Neal W. Settergren

By: /s *Robert Nienhuis*
One Memorial Drive, Suite 1000
St. Louis, MO 63102-2449
(314) 516-1700
Fax: (314) 421-2832
ATTORNEYS FOR PLAINTIFF MIKE'S, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on July 16, 2013, the foregoing document was filed electronically with the Clerk of Court to be served on the following counsel of record by operation of the Court's electronic filing system:

Theodore H. Lucas
Fox Galvin LLC
One South Memorial Drive
12th Floor
St. Louis, MO 63102
**Counsel for John Joslyn, White Star Line, LLC, and the vessel WHITE STAR ONE**

James S. Cole
Wasinger Law Group, P.C.
1401 South Brentwood, Suite 875
St. Louis, MO 63144
**Counsel for Regions Bank**

David G. Wasinger
Murphy Wasinger LC
1401 South Brentwood Boulevard, Suite 550
St. Louis, MO 63144
**Counsel for Regions Bank**

Andrew S. Buchanan
Buchanan Williams Stilley PC
7908 Bonhomme, Suite 200
St. Louis, MO 63105
**Counsel for ACF Property Management, Inc.**

/s *Robert Nienhuis*